UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

GREGORY E. BERNAL,                     )
                                       )
            Plaintiff,                 )
                                       )
    vs.                                )       Case No. 1:14-CV-80 (CEJ)
                                       )
CAROLYN W. COLVIN, Acting              )
Commissioner of Social Security,       )
                                       )
            Defendant.                 )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social
Security Administration.

## I.  Procedural History

On June 24, 2011, plaintiff Gregory E. Bernal filed applications for disability
insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq.*, and supplemental security
income benefits, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of
March 1, 2008.[1]  (Tr. 171-79).  After plaintiff's applications were denied on initial
consideration (Tr. 97-100), he requested a hearing from an Administrative Law
Judge (ALJ).  (Tr. 104-108).

Plaintiff and counsel appeared for a video hearing on April 22, 2013.  (Tr. 33-
63).  The ALJ issued a decision denying plaintiff's applications on May 3, 2013.  (Tr.
9-32).  The Appeals Council denied plaintiff's request for review on April 4, 2014.
(Tr. 1-6).  Accordingly, the ALJ's decision stands as the Commissioner's final
decision.

---

[1] The record shows that plaintiff previously filed applications on June 3, 2008 and July 1, 2009, also
alleging disability beginning approximately on March 1, 2008.  (Tr. 155-170).  These applications were
final and binding and not reopened by the ALJ.  (Tr. 12, 87-91, 92-96).

## II. <u>Evidence Before the ALJ</u>

### A. <u>Disability Application Documents</u>

In the Disability Report filed by the Field Office after a face-to-face interview with plaintiff on June 3, 2008 (Tr. 199-202), the interviewer noted that plaintiff was well-groomed, pleasant, and did not appear to have "any difficulty doing anything." In the Disability Report plaintiff completed on June 5, 2008 (Tr. 223-29), plaintiff listed his disabling condition as a bulging disc in his back. The bulging disc was very painful and uncomfortable, did not allow plaintiff to sit for long periods of time, and caused difficulty bending and twisting. Plaintiff worked after his disabling condition began, but stated that he had to shorten his hours and no longer was allowed to carry anything, bend, or twist. A few months after his condition began, he stopped working since his injury limited his ability to work and he was in pain.

In the Function Report plaintiff completed on June 12, 2008 (Tr. 230-37), he wrote that the severe pain caused by his bulging discs in his back kept him from working since he was unable to lift up to 50 pounds and twisting, bending, walking, sitting, or lifting aggravated his condition. He took Skelaxin and Darvocet for his condition. Since he had stopped working, plaintiff noted that he was unable to do laundry, dishes, vacuum, or sweep because of his back pain. (Tr. 233). He had difficulty sleeping because of tingling in his toes, leg cramps, and back pain, which began after a work accident on February 28, 2008. Plaintiff wrote that he was unable to sit and watch even a 30-minute television show, because sitting too long aggravated his back. (Tr. 234). He did not report any problems reading and was able to drive a vehicle, but not for extended periods of time. Plaintiff drove his

mother to and from work on weekdays, a distance of six miles.  (Tr. 235).  He did not have problems getting along with others.

In the Disability Report filed by the Field Office on July 1, 2009 (Tr. 247-50), the interviewer who met with plaintiff face-to-face noted that plaintiff had difficulty reading, understanding, sitting, standing, and walking.  The interviewer wrote that plaintiff's wife had to help him considerably throughout the interview by helping him answer questions and read all the necessary paperwork for him.  (Tr. 249).  Also, plaintiff had to alternate between sitting and standing about every 20 minutes throughout the interview.

In his Disability Report dated July 2, 2009 (Tr. 251-58), plaintiff listed his disabling conditions as bulging discs, chronic pain, bipolar disorder, anxiety, and learning disability/comprehension.  He wrote that his conditions limited his ability to work, because he constantly had to adjust his position from sitting to standing.  He could stand for approximately 15-20 minutes before he needed to sit, and he could sit approximately 30-45 minutes before he needed to stand and move around.  He reported that he could walk approximately 1/8 to 1/4 of a mile before he needed to stop and sit down.  Plaintiff had a limited range of motion and could not lift more than 50 pounds at a time.  He also reported severe mood swings.  His conditions first interfered with his ability to work in 2005.  He wrote that he stopped working on June 26, 2009 because his car was repossessed and, as a deliver driver, "since I have no transportation I have no work."  (Tr. 252).  As a delivery driver, plaintiff loaded trucks, delivered furniture, opened boxes, hung art work, and completed other warehouse duties as needed.  This job required him to walk, stand, stoop,

kneel, crouch, reach, and handle big and small objects for seven hours a day. In his work as a delivery driver, he frequently lifted 100 pounds. (Tr. 254).

In the Function Report he completed on July 27, 2009 (Tr. 259-69), plaintiff wrote that in the mornings he woke up, had breakfast, sulked, cried, and thought of ways to ignore the thoughts in his head. As to his daily activities, plaintiff would look on the Internet for work, watch television, and try to occupy himself. He would become frustrated and depressed, scream and cry. He sat until it hurt and then he would alternate to standing. Plaintiff helped his wife get dressed each day, fed his sons, and straightened up the house. (Tr. 260). He showered, but would bathe quickly since it hurt. His wife would sometimes need to remind him to take his medications because he would forget. Daily he prepared his own meals, including eggs, bacon, spaghetti, ramen, and frozen pizza. It took him a while to prepare food, because he had to keep sitting down. For household chores, plaintiff did laundry, cleaned dishes, vacuumed, and dusted. He noted that everything took a long time because of his pain. (Tr. 261). He also needed encouragement to do chores, because he would become depressed and disinclined to do anything. Three to four times a day plaintiff would sit on his porch. (Tr. 262). He could drive to the store, but would ride in an electric cart since he could not walk for a long period of time. Plaintiff's hobbies included playing videogames, watching television, and surfing the internet. (Tr. 263). Throughout the day, however, he needed to alternate between sitting and standing when his back began to hurt.

Plaintiff further wrote that he spent time with his wife and his children. He had problems getting along with others when he became angry and depressed, however, and would scream and wonder why the world was against him. (Tr. 264).

With regard to his abilities, plaintiff wrote that he could only lift 50 pounds and it hurt to squat, bend, stand, walk, sit, kneel, or climb stairs. He could walk for about 15 minutes before it hurt and he needed a 5-10 minute break. Plaintiff wrote that he had OCD, so it was sometimes hard for him to pay attention or follow written instructions. He had become very forgetful and had a difficult time concentrating. (Tr. 266). He also wrote that he did not like doctors and had no respect for them. (Tr. 265). When he worked at a pizza restaurant, plaintiff had an outburst in front of other employees and customers that caused him to lose his job. He could not handle stress, felt that he was losing his mind, and thoughts of suicide filled his head. Plaintiff no longer had a routine and had a hard time keeping things in order. He noted that he had unusual anger, would throw stuff, scream, yell, cry, and become frustrated very easily. (Tr. 265-66). He wrote that he was "seriously considering locking [him]self up" because he found no purpose in life and feared he would hurt or kill himself. (Tr. 265-66). Plaintiff's wife had helped him complete the report, since he reported that the words seemed jumbled to him and he could not understand the questions. (Tr. 269).

In his Disability Report dated June 24, 2011 (Tr. 284-90), plaintiff listed his disabling medical conditions as bulging discs, chronic pain, bipolar, and anxiety. In his Disability Report filed for his appeal, plaintiff stated that his pain level was 10, and he had acquired new physical and mental limitations of high blood pressure and bipolar stemming from his health conditions. (Tr. 315-22).

Plaintiff completed an additional Function Report on June 29, 2011. (Tr. 291-301). He wrote that in the mornings he awoke in pain and went to work. Usually about halfway through his day at work, his "sciatic in [his] back and hip" hurt to the

point that it was uncomfortable for him to sit, stand or walk.  (Tr. 291-92).  When he went home after work, he would take a pain pill and muscle relaxer to ease the pain, and then take a bath to soak.  He had trouble going to sleep because of the pain, and usually woke up 2-3 times a night due to his pain.  Plaintiff wrote that he could not remember the last time he was not in pain.  He reported that medicine helped the pain, but not much.  Daily he prepared his own easy-to-fix meals, such as sandwiches and soups.  With respect to house and yard work, plaintiff wrote that he could perform most chores, "I just pay for it later in the day or evening with pain in my back, leg, and hip."  (Tr. 293-95).  He tried to complete household chores quickly so he could "beat the pain."

Plaintiff was capable of driving, but would ride on an electric cart when he went to a store.  His hobbies and interests included watching television, playing video games, and playing cards.  For social activities, plaintiff used to go out, run, and play ball, but found it difficult to enjoy these activities due to his pain.  (Tr. 296).  When his back was in severe pain, he became agitated and short-tempered with others.  Plaintiff had difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, completing tasks, concentration, following instructions, and getting along with others.  He could only walk a few blocks before needing a rest.  Plaintiff reported that he did not get along well with authority figures, including bosses, landlords, and doctors.  He was discharged from his last job for "insubordination."  He also reported feeling depressed and that he could not "escape" himself or all the pain he felt.  (Tr. 297).

Plaintiff's Work History Report shows that he was employed full-time as a delivery driver at a furniture design firm, a moving company, and a pizza company

for approximately 16 years, until June 2009.  (Tr. 302-13).  In his Work Activity Report dated June 5, 2008, plaintiff stated that he was injured in February 2008 on the job as a delivery driver at a design firm, continued to work in March, could not work in April, and was terminated in May 2008 when he returned to work with permanent restrictions on his physical abilities to do his job.  (Tr. 213-22).  In 2010 and 2011, he worked in short-term positions as a dietary aid for a nursing home and as a law care laborer at an independent living center.  (Tr. 302).  As a delivery driver, plaintiff lifted boxes that weighed up to 50 pounds.  (Tr. 303).  On August 1, 2011, he provided notice to the independent living center that he was no longer able to perform his lawn maintenance duties due to his back condition.  (Tr. 314).

## B.   <u>Testimony at the Hearing</u>

Plaintiff was 46 years old at the time of the hearing.  (Tr. 37).  He had completed eleven years of education, and stated that he had a slight problem with reading comprehension.  (Tr. 38).  He also stated that he was apprehensive around other people.  Plaintiff had worked as a delivery driver for two furniture companies from 1999 until 2008.  (Tr. 39, 57).  While he was a delivery driver, he and a team partner would manually load household furniture in excess of 50 pounds onto trucks.  Plaintiff also had a class C driver's license and had prior relevant work experience delivering furniture.

Plaintiff testified that his most severe medical condition was his lower back pain, which went into his hip and down his right leg.  (Tr. 41).  He stated that his back felt like an accordion on most days—as if someone could pull it apart and then push it together—and he felt excruciating pain when his back popped.  Epidural injections in his back provided relief that lasted about a month, but the same prior

level of pain returned after the injection wore off.  Two neurosurgeons had met with plaintiff, but did not schedule him for surgery.  One of the doctors had told plaintiff he did not see anything that was operational.  (Tr. 42).

Oxycodone and Skelaxin helped take the edge off plaintiff's pain.  (Tr. 42).  Plaintiff testified that he could not walk around Wal-Mart without having a substantial amount of pain, he found himself having to lay down about a third of the day because of pain, he could not do most household activities, and the pain interfered with his ability to perform sexually.  (Tr. 43).  Generally, plaintiff stated that he could sit for an hour or an hour and a half before he needed to stand up or lay down to try to relieve the pain.  He then could lie down for a few hours or stand up for 30 minutes before he needed to switch positions again.  Plaintiff stated that he could walk about 20 to 30 minutes before needing to sit down.  He could lift or carry less than 20 pounds.  Bending, twisting and stooping aggravated his back pain, and he avoided these movements.  (Tr. 45).

The medications plaintiff took made him sleepy, distorted his sense of equilibrium, and gave him diarrhea.  His doctor had not yet discovered which medication caused these adverse side effects.  Plaintiff requested to switch from sitting to standing during the hearing.  (Tr. 45).  He had brought a cane to his hearing, which he had purchased without a prescription one year earlier to help him keep his balance.  (Tr. 46).

After plaintiff's alleged onset date, the ALJ noted that plaintiff had worked part-time for several employers from 2008 through 2011.  (Tr. 47, 53).  Plaintiff stated that he had continued working because he was trying to maintain a life for his family.  (Tr. 47).  His employers had allotted him limited work hours and one

employer let him go because he had been given 50-pound weight restriction through a worker's compensation claim. (Tr. 47-48). Plaintiff had problems doing his other jobs because of back pain as well.

Plaintiff testified that his bipolar disorder and depression made it difficult for him to carry on with everyday life and he heard voices in his head. (Tr. 48-49). Every morning he woke up knowing that he could not accomplish daily activities and became depressed. On three or four days a week he felt that he didn't want to get out of bed, eat, or shower.

Plaintiff lived in a mobile home with his two teenage sons and his mother. (Tr. 49-50). His sons cleaned the house, and plaintiff prepared meals in the household. Plaintiff's mother was on dialysis. On an average day, plaintiff woke up at 9:00 a.m., got out of bed, watched television, and tried to clean or dust the house. (Tr. 50-51). During the day, he napped when his back was bothering him or watched television. After his sons returned home from school, plaintiff would try to help them with their homework and prepared dinner. In the evening, plaintiff watched television and went to sleep at 8:30 or 9:00 p.m. He would wake up in the middle of the night a number of times, because he would find himself lying in the wrong position or his legs felt restless. In total, he slept five to six hours a night. Plaintiff slept on either a hard mattress or the floor.

For social activities, plaintiff tried to attend his son's music concerts and collected coins. (Tr. 52). Since March 2012, plaintiff testified that he prepared meals and did some light cleaning for his mother 17 hours a week, earning $8.00 an hour. (Tr. 53-54). Plaintiff maintained a driver's license and drove an automobile 25 to 30 miles a week. Plaintiff testified that he had worked primarily

hard labor jobs in the furniture industry since he was 15 years old until the date he hurt his back. (Tr. 55).

Kristine E. Skahan, M.S., a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education and work experience. (Tr. 56). Ms. Skahan first noted that plaintiff's prior work as a delivery driver constituted semi-skilled work typically classified at the medium exertional level but reported by plaintiff as work at a heavy to very heavy exertional level. (Tr. 57). For the first hypothetical posed by the ALJ of an individual 46 years of age with an 11th grade education and past relevant work similar to plaintiff's, the vocational expert testified that such an individual would be capable of doing the prior work of a deliver driver as typically classified at the medium level, but not as performed by plaintiff at the heavy to very heavy levels.

The ALJ then asked Ms. Skahan if a second hypothetical individual who could perform both light and medium work, but required a sit/stand option for one to one-and-a-half hours as an additional restriction would be able to perform plaintiff's past relevant work. Ms. Skahan replied that it varied based on how often a person could sit and stand depending on the type of load, but concluded that such a person likely would not be able to perform the past work as a delivery driver. (Tr. 58). The ALJ inquired whether there were any unskilled jobs for the second hypothetical person. The vocational expert responded that such an individual could work a range of light jobs, such as a photocopy machine operator or a cashier II. (Tr. 59). The ALJ then asked the vocational expert if it would be work preclusive if an individual needed to take unscheduled rest breaks during the day that could last up to a couple of hours. (Tr. 59). The vocational expert testified that such a person

would be unemployable. According to the vocational expert, if a person missed more than one day per month unscheduled, he or she would be terminated from employment.

The ALJ next posited a hypothetical of a person who can perform light or medium work, requires a sit or stand option every one to one-and-a-half hours, is limited to simple, repetitive tasks, and has an additional moderate restriction in their ability to tolerate stress and maintain concentration, persistence, and pace. (Tr. 60). The ALJ defined "mild" as non-severe, "marked" as no useful ability, and "moderate" as a range between those two extremes where an individual has difficulty performing the task but is able to complete it successfully. (Tr. 60-61). He defined stress in the context of a person's ability to perform work at higher or lower competitive levels. The ALJ asked if such a person with these additional restrictions could still perform the work the vocational expert provided for the second hypothetical. Ms. Skahan responded that the cashier job would be eliminated, since it was a more stressful work environment. However, she opined that such a person could still work the photocopy machine operator job since it was repetitive and had very little changes in day-to-day duties.

The ALJ continued with this hypothetical person, increasing the degree of restriction from "moderate" to "marked," where the person could function with difficulty some days, but other days could not function in terms of tolerating stress and maintaining concentration, persistence, and pace. (Tr. 61-62). The vocational expert opined that this increased restriction would eliminate all jobs since the individual would be unable to keep up with the competitive pace expected in a place of employment.

## C.  **Medical Records**

Plaintiff sought medical treatment from Bradley A. Breeden, D.O. at Concentra Medical Centers on July 17, 2007.  (Tr. 364-65).  At this time, plaintiff was working for Edwin Pepper Interior and complained of a shoulder injury from a work-related incident on June 29, 2007.  Plaintiff stated that he had been carrying a desk above his head while going down a set of steps when he felt something pop in his right shoulder.   Plaintiff received emergency care and had three sessions of physical therapy at St. Mary's after the incident.   He had been placed on a 10-pound push, pull, and lift restriction.   On the date of his appointment with Dr. Breeden, plaintiff reported no current pain.  He could not identify any exacerbating factors and denied radicular symptoms, bruising, redness, swelling, morning stiffness, or limited movement.  He reported taking some of his mother's Ultram[2] for his injury.

Upon a musculoskeletal examination of plaintiff's right shoulder, Dr. Breeden found no abnormalities of appearance and that plaintiff had normal shoulder range of motion in all planes without pain.  Normal sensory function was noted.  Palpation of the shoulder revealed no tenderness to the anterior, posterior, or axillary areas. Cervical, trunk, and elbow ranges of motion were normal in all planes without pain. A review of the x-ray report from St. Mary's shoulder study was negative.   Dr. Breeden assessed plaintiff with shoulder strain and determined that plaintiff was at maximum medical improvement without permanent impairment.   Plaintiff was instructed to return to the clinic as needed.

---

[2] **Error! Main Document Only.**Ultram is a centrally-acting synthetic opioid indicated for management of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of pain for extended periods of time.  See Phys. Desk. Ref. 2428-29 (63rd ed. 2009) (discussing extended release product).

The records indicate that plaintiff next returned to Concentra Medical Centers on March 3, 2008 and was seen by Gary J. Gray, M.D. (Tr. 361-63). At this time, plaintiff complained of a work-related injury to his back from February 28, 2008 while employed at Edwin Pepper Interiors. He stated that he was lifting a 300-pound buffet onto the back of a truck and while stepping backwards he felt a sudden sharp and tingling pain on the left. He injured his midline lower back, lumbar region and inner aspect of the left lower leg. Plaintiff reported his pain intensity level as 6/10. His symptoms were exacerbated by bending or movement and alleviated by resting. Dr. Gray noted that plaintiff had had a previous work-related back injury two years prior for which he had had a negative MRI. Plaintiff improved after that incident with conservative therapy after a relatively short period of time.

Upon physical examination, Dr. Gray noted that plaintiff had a negative 80-90 degree bilateral leg raise.[3] Dr. Gray found no costovertebral angle tenderness, no ecchymosis, no erythema, and no external trauma. Plaintiff had point tenderness over the left lower back area and the left leg. He did not have palpable spasm or spinous tenderness. His reflexes were symmetric and he had a normal gait. Dr. Gray also found that plaintiff had normal sensation, negative Waddell's,[4] and negative bilateral hip flexion. There was some stiffness on side ending and axial rotation. Forward bending was difficult for plaintiff, and he could not touch his toes. A lumbosacral spine x-ray with three views, however, was negative. Dr.

---

[3] The straight leg raise test is used to diagnose disk herniation. If a patient feels pain down his or her leg and below the knee when the doctor lifts the affected leg with a straight knee, the patient tests positive for a herniated disk. http://orthoinfo.aaos.org/PDFs/A00534.pdf.

[4] **Error! Main Document Only.**Waddell's signs are a group of physical signs in patients with low back pain. They are thought to be indicators of a nonorganic or psychological component to pain. The presence of three or more signs is positively correlated with high scores for depression, hysteria and hypochondriasis on the Minnesota Multiphasic Personality Inventory. http://en.wikipedia.org/wiki/Waddell's_signs.

Gray assessed plaintiff with thoraco lumbar muscular strain and prescribed Diclofenac[5] 75 mg twice a day, Skelaxin[6] 800 mg at bedtime, and Tramadol[7] 50 mg single tablets every four hours as needed for pain. Plaintiff was instructed to return to work with restrictions and begin physical therapy and a home exercise program as soon as possible. Dr. Gray did not expect plaintiff to have a permanent injury from this incident.

On March 7, 2008, plaintiff returned to Concentra Medical Centers and was treated by Debabrata Banerji, M.D. (Tr. 359-60). Plaintiff complained of pain in his left lower back with radiation down his left leg to his calf. He denied any numbness or tingling. Dr. Banerji noted that plaintiff had not yet begun physical therapy. Plaintiff reported that he was taking the medication prescribed by Dr. Gray with no improvement. Dr. Banerji found that plaintiff's general condition was satisfactory upon physical examination. Plaintiff did not have a deformity of the spine, had normal straight leg raises, normal rotational bending without pain, and normal hip movements. Dr. Banerji diagnosed plaintiff with lumbar strain and instructed him to continue working with restrictions as before. He also was instructed to continue his medication as before, except for Tramadol since it was not helping him. Plaintiff was instead prescribed Darvocet[8] and instructed to schedule physical therapy as soon as possible.

---

[5] **Error! Main Document Only.**Diclofenac is an NSAID used to relieve pain, tenderness, swelling, and stiffness caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a689002.html (last visited on Sept. 1, 2011).

[6] **Error! Main Document Only.**Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomfort associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1685 (60th ed. 2006).

[7] **Error! Main Document Only.**Tramadol is prescribed for treatment of moderate to moderately severe pain. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

[8] **Error! Main Document Only.**Darvocet is a centrally acting narcotic analgesic agent indicated for relief from mild to moderate pain. It can produce dependence. See Phys. Desk Ref. 3497 (60th ed. 2006).

On March 12, 2008, plaintiff had his first visit with a physical therapist. (Tr. 366-70). Plaintiff complained of low back pain with radiating numbness, tingling and pain into his right leg to Sherri R. Falconer, P.T. He stated that he was feeling worse since his work accident on February 28th. Plaintiff reported his essential job functions at Edwin Pepper Interiors as driving, lifting 300 pounds with the assistance of another, pushing and pulling 100 pounds, bending, walking, standing, and squatting. Exacerbating factors were getting up, prolonged sitting, standing, and walking. Alleviating factors were lying down and resting on his back or on the floor. Plaintiff rated his pain as 6/10. The physical therapist's objective findings included no gross asymmetries in plaintiff's posture, guarded transitional movements, antalgic gait with decreased weight bearing on his right, tenderness to palpation at the sacrum and B piriformis, an active range of motion in plaintiff's lumbar region, and hamstrings that fully flexed with pain.

The physical therapist noted that plaintiff's examination was consistent with the medical diagnosis of lumbar strain. Physical therapy was needed to address plaintiff's deficits, but plaintiff demonstrated a good prognosis for improvement. The therapist estimated that plaintiff's therapy goals could be achieved within six visits and he would be able to return to work at the same job with the same employer. Plaintiff's functional goals included the ability to use the treadmill for 10 minutes, lift 100 pounds from the floor to his waist once without an increase of his symptoms, and push or pull 100 pounds for a distance of 20 feet twice without an increase in symptoms. His plan of care included a home exercise program twice a day, modalities as needed, and range of motion, strengthening, manual therapy

and body mechanics three times a week until his goals were met or progress plateaued.

Also on March 12, 2008, plaintiff again saw Dr. Gray at Concentra Medical Centers for a re-check of his February 28th work injury. (Tr. 357-58). Plaintiff noted that he had been working with duty restrictions and felt his pattern of symptoms was no better. The pain he experienced was located on his midline lower back, lumbar region, and he continued to complain of pain in both legs above the knees. The pain was described as an aching sensation with an intensity level of 8/10. Dr. Gray noted that clinically, however, plaintiff did not appear to have that degree of severity. Darvocet worked a little better for plaintiff's pain relief than Tramadol. Plaintiff also reported that he had gone to physical therapy once and felt better. Upon physical examination, plaintiff had some subjective tenderness to palpation over the sacrum and the coccyx with no pain reaction. He did not have spinous tenderness, his reflexes were symmetric, and he had a normal gait. Dr. Gray assessed plaintiff with lumbar muscular strain and planned to continue plaintiff's medications as before. Plaintiff would continue physical therapy and his home exercise program and apply ice as discussed. Dr. Gray again noted that no permanency was expected from plaintiff's injury.

The next day, on March 13, 2008, plaintiff went to physical therapy for a second visit. (Tr. 390-92). He reported soreness in his low back and an inability to sleep due to the pain. The pain radiated from his inner thigh to his groin. He reported a current pain level of 10/10 with no alleviating factors for his pain. He had complied with his home exercise program. Plaintiff had been working modified activity with acceptable tolerance and had tolerated the prior treatment without

adverse reactions. Plaintiff used the treadmill for one minute during his therapy session and then stopped due to an increase in symptoms. The physical therapist noted that plaintiff was positive for Waddell's signs for overreaction and positive for superficial tenderness. The therapist determined to continue with plaintiff's current treatment plan, including the use of hot packs and therapeutic exercises.

At his third visit for physical therapy the next day, plaintiff reported that his back continued to be sore. (Tr. 387-89). He rated his current pain level as 6/10. He denied radiating symptoms that day and was able to use the treadmill for eight minutes. The physical therapist noted that plaintiff's condition related to his presenting diagnosis was progressing slowly, but his symptoms were improving. At his fourth physical therapy visit on March 17, 2008, plaintiff reported that his back was feeling better and he did not have any aggravating factors. (Tr. 384-86). His pain level was 3/10 and he reported compliance with his home exercise program. Plaintiff was able to use the treadmill for six minutes, and then stopped with increased pain. The physical therapist determined that plaintiff's condition and symptoms were improving.

Plaintiff had his fifth scheduled physical therapy appointment on March 19, 2008. (Tr. 380-83). Plaintiff reported that his back continued to feel the same overall. His current pain level was 7-8 out of 10. He complained of radiating pain into his abdomen that day. Upon objective examination, plaintiff had no gross asymmetries in his posture, guarded transitional movements, antalgic gait with decreased weight bearing on the right, intact integumentary system integrity, grossly intact sensation to light touch in the L2-S1 dermatomes, and tenderness to palpation at sacrum and B piriformis. Plaintiff used the treadmill for 10 minutes at

a slow cadence that day.  The physical therapist found that plaintiff's condition was progressing slowly and his symptoms were unchanged.  He tolerated the current treatment well with no adverse reaction, so the therapist planned to continue plaintiff with his treatment plan with the same frequency and duration.

Plaintiff also returned to Concentra Medical Centers on March 19, 2008 for a re-check of his February 28th work injury and was seen by Rudolph E. Catanzaro, M.D.  (Tr. 355-56).  Plaintiff noted that he had been taking his medications and had attended five physical therapy sessions without any improvement.  He described the pain in his bilateral lower back and lumbar region as sharp, aching and burning with a pain intensity level of 8/10.  The pain radiated to his right leg, groin, and the lateral aspect of his leg.  The symptoms were exacerbated by flexion, extension, bending, lifting and twisting.  He could not identify any alleviating factors.

Upon physical examination, plaintiff appeared well-nourished, well-developed, and in no acute distress.  He had equal deep tendon reflexes.  His motor abilities were 5/5 with negative straight leg raises.  A musculoskeletal examination indicated that plaintiff had normal gait, symmetric reflexes, normal sensation, and a decreased active range of motion.  He had positive Waddell's signs for overreaction. Dr. Catanzaro noted that plaintiff had been sent to a radiologist outside of the office for an x-ray of his lumbosacral spine, which was negative.  Dr. Catanzaro assessed plaintiff with lumbar strain, and instructed plaintiff to continue Diclofenac 75 mg twice a day and Darvocet N 100 every 6 hours as needed.  Plaintiff's modified work activity included no lifting over 25 pounds, no bending more than 10 times per hour, and no pushing or pulling over 40 pounds of force.  Dr. Catanzaro also anticipated no permanent disability from plaintiff's work-related injury.

On March 21, 2008, plaintiff had his sixth visit with a physical therapist and reported feeling sore. (Tr. 377-79). He rated his pain as 6/10 and reported that nothing alleviated his pain. He reported shooting pain down his bilateral lower extremity and tingling in his lumbar area that went outward. He also complained of weakness in his bilateral lower extremity occasionally. Plaintiff indicated that he was working modified activity with fair tolerance. He reported a worsening of symptoms following his previous treatment. An objective examination found that plaintiff had tenderness to palpation at his lower lumbar spine and sacrum. He was able to use the treadmill for 10 minutes at 1.2 miles per hour during his therapy session. The physical therapist assessed plaintiff's symptoms as unchanged. The therapist also performed manual traction to plaintiff's lumbar spine while he was lying supine and had plaintiff perform stretches that provided some relief. However, plaintiff continued to rate his pain as worse after therapy. The physical therapist determined to continue plaintiff's therapy treatment plan with the same frequency and duration.

At plaintiff's seventh visit to the physical therapist on March 24, 2008, he reported that his back was feeling a little better. (Tr. 374-76). He stated that he still had some pain down his legs, but not as much, with a reported intensity rating of 5/10. Plaintiff indicated that he was working modified activity with fair tolerance. Objectively, the physical therapist found that plaintiff had the same range of motion as before, continued to demonstrate a 50% limitation of lumbar extension, and was progressing slowly with therapy intervention. Plaintiff was able to perform all of his exercises that day with complaints of minimal pain. Plaintiff stated that he did not

feel as much pain as he usually did after therapy. The physical therapist noted that plaintiff tolerated that day's treatment without adverse reactions.

At plaintiff's eighth physical therapy session on March 26, 2008, he reported a 45% overall improvement and a pain level of 6/10. (Tr. 371-73). He complained of pain in his central lower spine and into his bilateral legs with the right greater than the left into his groin, calf and posterior leg. He reported that everything made his back hurt and nothing made it feel better. Plaintiff reported compliance with the home exercise program. Upon objective examination, plaintiff had guarded transitional movements and antalgic gait with decreased weight bearing on his right after therapy. His sensation was grossly intact to light touch in L2-S1 deformities and he had an active lumbar range of motion. Plaintiff was able to walk on the treadmill for ten minutes at 1.6 miles per hour that day. During his exercises, plaintiff stated, "I am a very strong person, but I don't think this physical therapy is working." The physical therapist assessed plaintiff's condition as slowly progressing with unchanged symptoms. He demonstrated adherence with scheduled therapy visits and required minimal cues to perform his exercise program. It was noted that plaintiff had met his goal for the treadmill. Plaintiff was instructed to apply a hot pack to his lower back for 15 minutes and was given a list of therapeutic exercises to perform at home twice a day.

Plaintiff also returned to see Dr. Gray at Concentra Medical Centers on March 26, 2008 for a re-check of his February 28th work injury. (Tr. 353-54). Plaintiff felt that the pattern of his symptoms had not improved despite his use of medications and physical therapy. The pain, described as aching and sharp, was located on plaintiff's midline lower back and lumbar region. His pain intensity level

was 5/10 to 9/10.  The symptoms were exacerbated by sitting, standing or walking and alleviated by resting.  Upon a musculoskeletal examination, plaintiff's straight leg raises to 80 degrees caused him right lower back pain and he jumped a bit.  He did not have costovertebral angle tenderness, ecchymosis, erythema, external trauma, point tenderness, palpable spasm, or spinous tenderness.  His reflexes were symmetric.  He had good side bending and axial rotation and did not seem stiff.  Plaintiff had subjective pain on extension of his trunk.  Dr. Gray noted that a lumbosacral x-ray conducted was negative and assessed plaintiff with a lumbar muscular strain that was slow in progressing.  He prescribed Skelaxin 800 mg and Darvocet N 100 with no refills.  Plaintiff planned to stop physical therapy and return to the office in the morning to see Dr. Breeden for a back adjustment.  He was instructed to also return to work on restrictions and continue his home exercise program independently.  Dr. Gray continued to not expect plaintiff to have a permanent injury.

The next day, on March 27, 2008, plaintiff was seen by Bradley Breeden, D.O. at the request of Dr. Gray for evaluation for possible osteopathic manipulation for plaintiff's sacrococcygeal discomfort associated with his February 28th work incident.  (Tr. 351-52).  Plaintiff pointed specifically to the sacrococcygeal region of the low back as the area of his discomfort with 6/10 in pain intensity.  On examination, plaintiff was ambulatory without gait disturbance.  Palpatory examination of the area produced only mild subjective complaints.  Plaintiff's lumbar active range of motion was normal with forward bending to 90 degrees, backward bending to 30 degrees, and side bending rotation bilaterally at the waist to 45 degrees.  He demonstrated that he was able to walk on his heels and toes

with no discernible weakness. Standing hip flexion test, seated leg extension test, and straight leg raise tests were normal. Dr. Breeden discussed the risks and benefits of osteopathic manipulation with plaintiff as a modality for treating somatic dysfunction. After plaintiff agreed, he was taken to the physical therapy unit for osteopathic manipulation.

Plaintiff's leg lengths and pelvic symmetry were evaluated and his leg lengths were found to be normal. Plaintiff did, however, have pelvic asymmetry with the left anterior superior iliac mark being inferior, compared to the right, indicating somatic dysfunction to the pelvic structure. A gentle high-velocity, low-amplitude technique was applied to the entirety of the thoracic spine, with mobilization of multiple facets and ribs. Next, a high-velocity, low-amplitude technique was applied to the lumbosacral spine segment with mobilization of the sacrum and facets. Plaintiff tolerated these procedures well and reported significant incremental improvement of his symptoms. Dr. Breeden assessed plaintiff with lumbar strain, somatic dysfunction of the lumbar spine, and somatic dysfunction of the thoracic spine consistent with work activity. Plaintiff was placed on modified work duty consisting of 50 pounds for pushing, pulling and lifting. Dr. Breeden instructed plaintiff to discontinue Darvocet, utilize over-the-counter Tylenol or ibuprofen on a scheduled basis as needed for discomfort, and apply ice instead of heat to the affected area for 30-minute intervals with 30-minute breaks between ice packs when at home. He was scheduled for a follow-up appointment in five days for a reevaluation of his back with likely discharge at that time if all was well.

Plaintiff returned to see Dr. Breeden at Concentra Medical Centers on April 2, 2008 for a re-check of his injury. (Tr. 349-50). Plaintiff reported that he had been

working within his duty restrictions and had been taking his mediations without improvement. His reported pain was located in his sacral region with an intensity level of 3/10. The pain did not radiate and he could not identify any exacerbating factors. Upon physical examination, Dr. Breeden found that plaintiff's range of motion was within normal limits to all planes with subjective complaints of sacral discomfort. His sensation was intact to 2-point discrimination and within normal limits. Palpation was negative for pain at the sacral area bilaterally, and Waddell's signs were positive for overreaction. Dr. Breeden offered plaintiff osteopathic manipulation again that day, which plaintiff accepted. After manipulation, plaintiff reported significant improvement to his thoracic and lumbosacral segments. Plaintiff was instructed to continue his previous medications as prescribed, discontinue Darvocet, and begin use of Diclofenac[5] 75 mg twice a day. Plaintiff was also instructed to return for evaluation in six days and Dr. Breeden anticipated discharging plaintiff at that time.

On April 7, 2008, plaintiff returned to see Dr. Breeden at Concentra Medical Centers. (Tr. 347-48). Plaintiff reported that he had been relieved of his job, since he indicated that he could not work full duty due to his low back discomfort. Upon physical examination, Dr. Breeden noted that plaintiff did not appear to be in distress. His range of motion was within normal limits as to all planes with pain. Palpation was positive for pain at the sacral area bilaterally and his Waddell's signs were positive for overreaction. Dr. Breeden found no swelling, no palpable spasm, no erythema, no ecchymosis, and normal gait. The doctor noted that plaintiff's stated level of discomfort did not correlate to clinical evaluation. Despite the doctor's findings, plaintiff was adamant that he needed a diagnostic MRI. Dr.

Breeden explained the lack of objective findings and the likely low yield of an MRI. Nonetheless, the doctor spoke with the claims representative for plaintiff's worker's compensation claim, and the representative authorized the MRI study to be scheduled. Dr. Breeden assessed plaintiff with lumbar strain and provided plaintiff Naproxen[9] 550 mg, acetaminophen 500 mg by mouth four times a day, and Ultram 50 mg four times a day as needed for pain. Plaintiff's activity status was listed as modified activity with no lifting, pushing, or pulling over 40 pounds of force.

On April 9, 2008, plaintiff had an MRI of his lumbar spine without contrast. (Tr. 408). The results indicated that plaintiff's vertebral heights and alignments were maintained and a vertebrae compression fracture or discrete osseous lesion was not seen. At L5-S1, the disc was normal in signal and height, but a mild central annual disc bulge was present, producing a 2-3 millimeter compression. There was not significant foraminal encroachment at this level, however.

Plaintiff returned to see Dr. Breeden on April 11, 2008 to discuss the results of the MRI of his lumbar spine. (Tr. 345-46). Dr. Breeden noted that plaintiff did not show symptom magnification or self-limiting behaviors through examination, making an exact diagnosis of his condition difficult. His active range of motion for the lumbar spine was forward bending to 80 degrees, backward bending to 30 degrees, side bending and rotation bilaterally at the waist to 45 degrees with discomfort only for backwards extension. Plaintiff demonstrated the ability to walk on heels and toes with no discernible weakness. Dr. Breeden's palpatory examination of the back produced only mild right-side sacroiliac discomfort with noted exaggerated pain response. Dr. Breeden reviewed plaintiff's MRI report with

---

[9] **Error! Main Document Only.**Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. See Phys. Desk Ref. 2769-70 (60th ed. 2006).

him, which revealed mild central annular disk bulge at L5-S1 with no foraminal encroachment. The doctor thus maintained his assessment of plaintiff with lumbosacral strain consistent with work activity. Dr. Breeden referred plaintiff to see Dr. Tate for a consultative examination and instructed plaintiff to use over-the-counter Tylenol or ibuprofen on a scheduled basis as needed for discomfort. Dr. Breeden recommended plaintiff to return to full duty status at work.

Per Dr. Breeden's recommendation and the insurance company's request, plaintiff saw Sandra L. Tate, M.D. on April 14, 2008 for a consultative examination for his complaints of low back pain. (Tr. 394-98, 414-16). During his physical therapy, Dr. Tate noted that plaintiff had had electrical stimulation and had undergone exercise on the treadmill. He also had been given a home exercise program that included pelvic tilt, side-lying rotation, and knee-to-chest exercises. With respect to the physical therapy sessions he had completed, plaintiff stated, "They were torture and I felt worse after the therapy." Dr. Tate noted that plaintiff had been seen by Dr. Breeden for adjustments, which plaintiff also reported had not helped his symptoms. Dr. Tate reviewed plaintiff's MRI films, which were of fair quality and revealed a mild disk bulge at L5-S1. Plaintiff reported having some numbness and tingling down the posterior aspect of the right leg that was intermittent in nature and occurred about four times a day. He had been working light duty with a 40-pound restriction since his symptoms started.

Dr. Tate's examination of plaintiff's lumbosacral spine revealed diffuse tenderness noted throughout to palpation. Plaintiff's range of motion was at least 80% of normal throughout. There was no spasm or trigger point noted. Straight leg raises were negative to 90 degrees in sitting and lying positions. The sacroiliac

joint was non-tender. Posterior superior iliac spine and pelvic landmarks appeared symmetrical. Sacroiliac provocative tests did not increase his pain. Waddell symptom magnification indicators were positive. Upon musculoskeletal examination of plaintiff's lower extremities, no significant hamstring tightness was identified. Range of motion of plaintiff's hip, knee, and ankle was full bilaterally. Plaintiff did not have atrophy or fasciculation. Plaintiff's muscle strengths were 5/5 throughout, including the great toe extensors. There was no tenderness and no instability noted, and plaintiff's gait was within normal limits. Plaintiff was able to ambulate without specific deficits and did not have coordination deficits.

Dr. Tate discussed plaintiff's MRI results with him and told him that his findings were more degenerative in nature and she did not believe that the disk bulge was the etiology of his pain. Dr. Tate noted that plaintiff had symptom magnification. Because plaintiff engaged in heavy lifting at work, Dr. Tate recommended that he undergo a functional capacity evaluation and requested to see him in one week for a follow-up. Plaintiff returned to see Dr. Tate on April 21, 2008 after undergoing a functional capacity evaluation. (Tr. 399-400, 412-13). The evaluation results indicated that he was capable of lifting a maximum of 30 pounds with a goal of lifting at least 100 pounds. He provided maximal effort during the evaluation and Waddell signs were noted as insignificant. At his follow-up appointment with Dr. Tate, he complained of low back pain with a 4/10 intensity level, which he had had for the previous two days. Plaintiff had been taking Darvocet, Extra Strength Tylenol and Skelaxin. He reported that his right low lumbar area "feels like I'm being separated" and he had tingling in the right big toe

only.  He also reported that his pain improved if he had a chance to change positions, but was worse after he had been walking for a period of time.

Upon physical examination, plaintiff did not appear to be in acute distress, and was alert and oriented.  Motor strength testing was 5/5 for bilateral upper and lower extremities for biceps, triceps, wrist extensors, wrist flexors, shoulder abductors and finger flexors.  His lumbosacral range of motion was decreased.  Standing flexion test was positive on the right coinciding with positive right anterior superior iliac spine compression test.  Plaintiff's straight leg raise test was negative.  Patrick's Test[10] revealed decreased external range of motion.  A musculoskeletal examination of the lower extremities revealed bilateral hamstring tightness.  Pain in plaintiff's hips was greater with internal than external range of motion.  There was low back and sacral pain noted with both internal and external range of motion.

Dr. Tate assessed plaintiff with mechanical low back pain.  In light of his recent performance in his functional capacity evaluation, plaintiff told Dr. Tate that he was very motivated and would like to work towards returning to work with his current employer, with whom he had been employed for seven years.  His goal was to lift at least 100 pounds.  Therefore, Dr. Tate recommended that he undergo work hardening for 7-10 days and then follow up in her clinic in two weeks for re-evaluation.  In addition, mobilization was provided to the sacrum and the ilium as well as the L5 with a combination of muscle energy technique and facilitated positional release, which plaintiff tolerated quite well.  Plaintiff was also instructed on hamstring and piriformis stretches.  He was encouraged to continue doing

---

[10] Patrick's Test uses flexion, abduction, and external rotation motions to find pathologies at the hip, lumbar, and sacroiliac region.  http://www.physio-pedia.com/FABER_Test (last visited June 4, 2015).

stretching exercises for flexibility and would do mobilizations as needed during work hardening.

On May 5, 2008, plaintiff was seen for a follow-up appointment with Dr. Tate for his complaints of back pain. (Tr. 401-02, 417-18). He had had seven out of eight sessions of work hardening and had improved his lifting abilities up to 50 pounds. Plaintiff reported that he had missed one day of work because he had a really bad day after his therapy. However, he had two excellent days after that. He reported, "Trying to get to 100 pounds sounds pretty good." He had had some soreness after work hardening that lasted for several hours. Plaintiff reported that he was able to manage this soreness with his home exercise program and Diclofenac. He had been taking Skelaxin or Darvocet occasionally as well.

Dr. Tate's examination of plaintiff's lumbosacral spine revealed lumbosacral range of motion within normal limits. Mild hamstring tightness was noted. Straight leg raises were negative to 90 degrees in sitting and lying positions. Plaintiff's sacroiliac joint was non-tender. Posterior superior iliac spine and pelvic landmarks appeared symmetrical. Sacroiliac provocative tests such as pelvic rock and Patrick's maneuver did not increase his pain. No significant hamstring tightness was identified. Plaintiff's range of motion in his hip, knee, and ankle were full bilaterally. Plaintiff's muscles strengths were 5/5 throughout, and no tenderness or instability were noted. In her assessment, Dr. Tate noted that plaintiff had had difficulties with mechanical back pain, which appeared to be improved both objectively and subjectively. Dr. Tate recommended plaintiff undergo an additional eight sessions of work hardening and work the other half-days with a 50-pound restriction, which was plaintiff's idea. Plaintiff planned to discontinue Skelaxin, but

needed a refill of Diclofenac. He had a sufficient amount of Darvocet to take as needed.

Plaintiff next saw Dr. Tate for a follow-up examination on May 8, 2008. (Tr. 403-04, 410-11). He was seen earlier than his initial follow-up appointment since he had attempted to go back to work and experienced increased pain. Plaintiff had improved his lifting up to 50 pounds in his work hardening program. He reported that he had had one day of soreness after work hardening, but had been able to manage that soreness fairly well. Plaintiff reported that his current symptoms started after he returned to work on Tuesday and had done a substantial amount of sweeping, twisting and bending. He did not work yesterday because of this aggravation, but he did attend his work hardening session.

At this time, plaintiff reported that he was considering back surgery since his symptoms had worsened. However, Dr. Tate explained to plaintiff that he did not have a surgical condition. Examination of plaintiff's lumbosacral spine showed no paravertebral tenderness or muscle spasm. His range of motion was within normal limits. No trigger points were identified. Upon musculoskeletal examination of his lower extremities, no significant hamstring tightness was identified. Plaintiff's range of motion of his hip, knee and ankle were full bilaterally. Muscle strengths were 5/5 throughout. There was no tenderness and no instability noted. Because he was undergoing work hardening and attempting to return to his regular job, Dr. Tate opined that plaintiff would benefit from stopping any twisting, bending or sweeping at work so that he could try to return to his regular duties. Dr. Tate requested to see plaintiff in six days for a follow-up appointment. At that time, she anticipated that plaintiff would be near or at maximum medical improvement. Dr.

Tate did not believe that plaintiff was a surgical candidate or required injections. She noted that plaintiff had only mild degenerative disk changes.

Plaintiff returned to see Dr. Tate for a follow-up appointment on May 14, 2008. (Tr. 405-06, 420-21). Dr. Tate noted that plaintiff had continued work hardening sessions, but gained only 5-10 pounds of lifting capacity over the last week. His job required him to lift a total of 100+ pounds, and he was currently lifting up to 55 pounds with increased complaints of pain. Plaintiff noted that he felt plateaued and was not getting any better. He had been taking Darvocet as needed for pain and worked half-days in a light duty position recently. After conducting a physical examination, Dr. Tate noted that plaintiff had had continued subjective complaints of low back pain with a normal clinical exam. She also noted that plaintiff had plateaued with good effort in his work hardening program at the medium-demand work level. Therefore, Dr. Tate opined that plaintiff was at maximum medical improvement and could work with a restriction of lifting no more than 50 pounds. On May 22, 2008, Dr. Tate wrote a letter to Harford Insurance stating that, "Within a reasonable degree of medical certainty, I find the patient to have sustained a 3% permanent partial disability at the level of the lumbar spine due to his 02/28/08 work injury and lumbar strain. He remains at maximum medical improvement." (Tr. 407, 419).

On July 10, 2008, disability examiner Paul Lossman completed a Physical Residual Functional Capacity Assessment for plaintiff. (Tr. 64-69). Lossman found that plaintiff could occasionally lift or carry 50 pounds and frequently lift or carry 25 pounds. Plaintiff could stand, walk, and sit for about 6 hours in an 8-hour workday. Plaintiff did not have limitations in his abilities to push or pull. Lossman based his

findings on plaintiff's work-related back injury in February 2008, his physical therapy treatment, a recent physical examination that was completely normal outside of subjective complaints of back pain, the absence of tenderness or muscle spasms, and plaintiff's full range of motion in his back. (Tr. 65). Lossman noted that plaintiff had been diagnosed with lumbar strain and a mild disc bulge.

As to plaintiff's postural limitations, Lossman found that plaintiff could frequently climb, balance, stoop, and kneel, and occasionally crouch and crawl. Plaintiff did not have manipulative, visual, communicative, or environmental limitations. Lossman noted that plaintiff had said that he was unable to lift over 50 pounds, was limited in bending and twisting, could not do household chores, and spent his time in bed or on the couch. Considering plaintiff's diagnosis of a mild disc bulge, functioning in the medium demand level, and restriction to lifting 50 pounds, Lossman found plaintiff's alleged back pain to be partially credible at best.

Plaintiff's medical records next resume on July 26, 2009 with a visit to the emergency department of Poplar Bluff Regional Medical Center for complaints of lower back pain. (Tr. 629-30). Dr. Susan Hall requested plaintiff to have a renal scan to rule out kidney stones due to his symptoms of radiating pain from his testicle to left mid-back, but plaintiff refused a urinalysis or CT scan since he did not have health insurance. After receiving Meperidine[11] and Phenergan,[12] plaintiff stated that his pain was improved and he was discharged with instructions to return

---

[11] Meperidine is a narcotic analgesic used to relieve moderate to severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682117.html (last visited June 4, 2015).
[12] **Error! Main Document Only.**Phenergan, or Promethazine, is used to relieve the symptoms of allergic reactions such as allergic rhinitis (runny nose and watery eyes caused by allergy to pollen, mold or dust), allergic conjunctivitis (red, watery eyes caused by allergies), allergic skin reactions, and allergic reactions to blood or plasma products.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682284.html (last visited on Mar. 11, 2011).

if his symptoms worsened. Plaintiff was provided prescriptions for Naprosyn, Flexeril,[13] and Vicodin without refills.

On July 31, 2009, plaintiff was sent to Kneibert Clinic to see Naveed J. Mirza, M.D. for a psychiatric evaluation. (Tr. 423-27). Plaintiff told the doctor that he had been looking for a job but was unable to find one as he had a limitation in his physical activity. He stated that he had tried to work for a pizza place but he suddenly felt confused and unsure of where he was. Plaintiff further stated that he felt on edge most of the time and his family feared him as they did not know with what mood he would awake. Plaintiff also stated that he had trouble concentrating at times, which became worse when he was depressed or became emotional. Plaintiff had recently become hopeless with his situation to the point that he reported that he felt like hurting himself, but thoughts of his family and a fear of death prevented him from doing anything to harm himself. He felt that he had no control over his life, and increased economic stress had caused him to feel more stressed and emotional. He denied any manic, anxiety, or psychotic symptoms.

Upon a review of plaintiff's symptoms, Dr. Mirza found that plaintiff had a mild depressed mood, mild decreased energy, mild anxiety, moderate irritability, and mild problems with sleep. Dr. Mirza noted that plaintiff had no prior history of psychiatric illness or treatment. Dr. Mirza assessed plaintiff with an adjustment disorder not otherwise specified with mixed features. Plaintiff was assigned a Global Assessment Functioning (GAF) score of 55.[14] Dr. Mirza did not think that

---

[13] **Error! Main Document Only.**Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1832-33 (60th ed. 2006).

[14] **Error! Main Document Only.**A GAF of 51-60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric

plaintiff had any mental illness that would impair his ability to work at present and did not seem to have any functional limitation from his mental health. Plaintiff reported being unable to lift weight due to his back problems, so Dr. Mirza encouraged him to consider looking for jobs that did not require him to lift weight more than 50 pounds. Dr. Mirza found that plaintiff had good social skills and was able to express himself well during the interview, which the doctor noted might be helpful for plaintiff to acquire gainful employment.

On September 30, 2009, Kelly S. Smith completed a Physical Residual Functional Capacity Assessment for plaintiff. (Tr. 75-80). Smith opined that plaintiff could occasionally lift or carry 20 pounds, and frequently lift or carry 10 pounds. Plaintiff could stand walk, or sit for about 6 hours in an 8-hour workday. He was unlimited in his ability to push or pull. In support of her conclusions, Smith noted that an MRI of plaintiff's left spine revealed a mild disc bulge at L5-S1 without foraminal encroachment. His physical examinations were normal, and he did not have neurological abnormalities. Plaintiff applied for benefits in-person at the Social Security Administration, had good grooming, complained of persistent back pain, and alternated sitting and standing.

With respect to plaintiff's postural limitations, Smith noted that, based on his MRI findings, plaintiff could frequently climb stairs, balance, kneel and crawl, and occasionally climb ladders, stoop, and crouch. (Tr. 77). He did not have manipulative, visual, or communicative limitations. As to plaintiff's environmental limitations, Smith found that plaintiff should avoid concentrated exposure to vibration and hazards to prevent exacerbation of his pain and symptoms. (Tr. 78).

---

Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

However, plaintiff was capable of unlimited exposure to extreme cold, extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. Based on the total evidence, Smith concluded that plaintiff was capable of performing light work. She noted that plaintiff's statements about the severity of his symptoms and the clinical evidence were not fully consistent and his allegations were overall partially credible.

Also on September 30, 2009, Joan Singer, Ph.D. completed a Psychiatric Review Technique for plaintiff. (Tr. 428-39). Dr. Singer concluded that plaintiff had a non-severe affective disorder. Specifically, Dr. Singer found that plaintiff had an adjustment disorder not otherwise specified. Plaintiff had a mild restriction of daily living activities and mild difficulties in maintaining social functioning. Plaintiff had no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation. In her notes, Dr. Singer wrote that plaintiff alleged bipolar disorder, anxiety, and a learning disorder. Dr. Singer noted that plaintiff had previously filed for disability benefits in July 2008, and alleged no mental problems at that time. He also had no psychiatric history and had not had psychiatric treatment or counseling. He also had never been on any psychotropic medications. After reviewing Dr. Mirza's notes from plaintiff's psychiatric evaluation, Dr. Singer found no medically determinable impairment in the file for any of plaintiff's alleged impairments. She determined that plaintiff's statements about his symptoms and severity were not consistent with the clinical evidence and thus his allegations were not credible.

On November 15, 2009, plaintiff presented to the emergency department at Poplar Bluff Regional Medical Center with a sudden onset of acute left-sided chest

pain radiating to his left shoulder, left arm, and upper back that started while he was watching television at home. (Tr. 622-27). Plaintiff described the quality of his symptoms as sharp, of moderate intensity, exacerbated by movement, and relieved by nothing. His physical examination, however, was normal. An EKG showed a normal rate and rhythm with no evidence of acute ischemia or injury. All labs reviewed showed no clinically significant abnormalities. A chest x-ray showed no acute disease and radiology test results found no evidence of an acute cardiopulmonary process. Plaintiff was provided oxygen, a transdermal medication nitropaste on his chest wall, and potassium chloride 40 meq. Less than two hours after his arrival, plaintiff reported that the chest pain was completely resolved and he was pain-free. Dr. Susan Hall discharged plaintiff home in stable condition.

Plaintiff's medical records resume on June 7, 2011 with an office visit to see Kirby Turner, M.D. at Kneibert Clinic for complaints of hip and back pain. (Tr. 447-50). The pain started in plaintiff's lower back and radiated to the top of his right leg. Plaintiff stated that he had been wrestling with his son and had been hurting since. Plaintiff stated that he had two bulging discs in his back and also had a non-radiating chest pain that felt like a band around his chest. On a scale of 1-10, plaintiff described his pain as a 9. Dr. Turner noted that a possible psychosocial cause for plaintiff's back pain included the failure of previous therapy. Plaintiff's motor exam, strength, reflexes and straight leg raises were all normal. Plaintiff reported currently taking Norco[15] 10-325 mg every four hours as needed, Flexeril 10 mg tablets twice a day, and Bystolic[16] 5 mg tablets daily. Plaintiff had smoked

---

[15] **Error! Main Document Only.**Norco is a combination of hydrocodone and acetaminophen. See Phys. Desk. Ref. 3188 (63rd ed. 2009).
[16] Bystolic, the brand name for Nebivolol, is a beta blocker used to treat high blood pressure. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a608029.html (last visited June 4, 2015).

½ to one pack of cigarettes a day since 1980.  Dr. Turner assessed plaintiff with back pain, chest pain, and erectile dysfunction.  He ordered a complete EKG and x-ray of plaintiff's chest and requested plaintiff to schedule a follow-up appointment in one month.

On June 15, 2011, plaintiff returned to Kneibert Clinic with a complaint of left ankle pain.  (Tr. 445-46).  He had stumbled and came down hard on his left heel. Upon physical examination, plaintiff's ankle seemed normal, mobile, and not swollen with a tender heel.  A radiograph of the left ankle read within normal limits. The doctor advised plaintiff to wear an orthopedic boot on his left foot for 3-6 weeks.  The doctor noted that plaintiff's injury looked most like a deep calcaneal bruise.  Plaintiff was instructed to follow up as needed.  Plaintiff saw Dr. Turner at the Kneibert Clinic for a follow-up appointment on June 24, 2011.  (Tr. 441-44).  He complained of back pain and an inability to sleep.  He stated that his blood pressure had been running high and he had been unable to take Bystolic because it made him dizzy, lightheaded, and irritable.   Dr. Turner ordered an x-ray of plaintiff's lumbar spine and provided him prescriptions for Norco and Flexeril.

Plaintiff received mental health care from John Daniel Barbour, Ph.D. at Kneibert Clinic on July 1, 2011.  (Tr. 458-62).  At the appointment, plaintiff stated, "I've been really depressed and I can't get out of my own head.  My moods change on a dime.  I can go from being normal from being very pissed off.  It's kind of like I'm claustrophobic in my own mind."  Plaintiff reported that he had chronic pain that was extremely difficult to cope with and emotional problems that seemed to result from his pain.  He reported that he began the day better with regard to the pain but it became much worse by the end of the day.  Plaintiff worked for the

Independent Living Center as a lawn care worker at this time. Plaintiff stated that he could not recall the last time he had had a good night of sleep, partly due to pain and partly due to emotional problems. He reported that he had lost interest in things he formerly enjoyed, such as recreational activities. He felt "pretty worthless." Plaintiff also reported having 1-3 anxiety attacks a week and having a difficult time concentrating due to pain and constant racing thoughts. He reported that he had had suicidal thoughts while he was taking Bystolic, but had not those thoughts since he quit taking the medication.

Plaintiff was easily distracted and had insomnia. Plaintiff found he could be easily angered at times, such as while watching world news. He denied high risk activities or excessive pleasure seeking. Plaintiff did not like to be around people and became fearful in large crowds. Plaintiff stated that he became very irritable "over the littlest thing." Plaintiff reported that he had thoughts he could not keep off his mind. He was compulsive about the way things were done, his coin collection, keeping things clean, and germs. Plaintiff had a lot of muscle tension in his neck and back and had continuous headaches. Plaintiff reported, "I don't trust anybody." He thought people were out to get him and were not really his friend. Plaintiff had no prior history of psychiatric illness or treatment.

Dr. Barbour found that plaintiff had a severe depressed mood, oppositionalism and somatic complaints. Plaintiff had moderate grief, obsessions, compulsions, elevated mood, thought disruption, delusions, paranoia, panic attacks, hyperactivity, trauma victim, anxiety, irritability, impulsiveness, and problems with sleep. Plaintiff had mild hopelessness, disassociation, and problems with his appetite. Dr. Barbour noted that plaintiff had experimented with crack in his

twenties, but had not touched it since.  Plaintiff had taken LSD as an adolescent.
Plaintiff reported that he lived with his mother and two sons.  He had two grown
daughters.  He had been married three times, but was currently separated from his
wife and had a girlfriend.  Dr. Barbour assessed plaintiff with a mood disorder not
otherwise specified, ruled out obsessive compulsive disorder, and found plaintiff
had an anxiety disorder not otherwise specified.  He assigned plaintiff a GAF score
of 50.[17]  Dr. Barbour referred plaintiff to Linda Sue Hammonds for medication
management and scheduled follow-up counseling.

Mel Moore, M.D. performed a case analysis of plaintiff's medical records and
subjective reports of his back pain on July 20, 2011.  (Tr. 466).  Dr. Moore
determined that the objective evidence did not support all of plaintiff's allegations
and deemed plaintiff's condition as non-severe.

On July 29, 2011, Sherry Bassi, Ph.D., completed a Mental Residual
Functional Capacity Assessment for plaintiff as a consultative examiner.  (Tr. 467-
69).  Dr. Bassi found that plaintiff was not significantly limited in his ability to
understand and remember.  She found that plaintiff was moderately limited in his
ability to maintain attention and concentration for extended periods of time and his
ability to complete a normal workday and workweek without interruptions from
psychologically based symptoms, but was not otherwise limited in his concentration
and persistence.   Plaintiff was moderately limited in his ability to interact
appropriately with the general public, to accept instructions and respond
appropriately to criticism from supervisors, to get along with coworkers or peers
without distracting them or exhibiting behavioral extremes, and to maintain socially

---

[17] **Error! Main Document Only.**A GAF of 41-50 corresponds with "serious symptoms OR any serious
impairment in social, occupational, or school functioning."  American Psychiatric Association,
Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

appropriate behavior and to adhere to basic standards of neatness and cleanliness. Plaintiff did not have any significant limitations in his adaptation abilities. In her functional capacity assessment, Dr. Bassi noted that plaintiff could follow simple directions and make basic work-related decisions. He could relate adequately to peers and supervisors and could adapt to routine changes in a work environment.

Dr. Bassi also completed a Psychiatric Review Technique for plaintiff on July 29, 2011 based on a review of the record. (Tr. 470-81). Dr. Bassi opined that plaintiff had a mood disorder not otherwise specified and anxiety disorder not otherwise specified. Plaintiff had a mild restriction of daily living activities, moderate difficulties in maintaining social functioning, concentration, persistence or pace, and no repeated episodes of decompensation. Dr. Bassi noted that plaintiff's mental status examination from July 1, 2011 was essentially within normal limits. She also considered plaintiff's activities of daily living. Dr. Bassi concluded that plaintiff's allegations were partly credible. He had limited mental health contacts and there was no evidence in the file supporting a diagnosis of bipolar disorder. It was noted that plaintiff stated that he was limited from working full-time due to his pain conditions and not his depression. He stated that he could follow directions easily but had difficulties with his temper on the job. Overall, Dr. Bassi found that the results suggested a capacity to perform simple work in an environment which does not require stressful or complex social interactions.

On August 29, 2011, plaintiff had an MRI of his lumbar spine. (Tr. 620-21). Results showed that the alignment of plaintiff's lumbar spine was normal. There was no bone marrow edema or signs of compression deformity. There was no pars defect or subluxation. The lumbar spinal cord demonstrated normal T2 signal. The

impression from the exam found mild degenerative disc disease and disc bulge at the L4-5 level. There was no central canal stenosis, no disc protrusions or disc herniations, and no spondylolisthesis seen. Plaintiff had surgery to release a trigger finger at the Surgery Center of Poplar Bluff on November 1, 2011. (Tr. 640-41). He tolerated the procedure well and did not have complications. His wound healed well with very little or no pain. (Tr. 639).

On November 3, 2011, plaintiff had an initial pain clinic consultation with Benjamin Soeter, M.D. at Poplar Bluff Regional Medical Center. (Tr. 608-10). He complained of pain in his back as well as the right leg down to the inside of his big toe. It was a burning, tingling, numb, sharp, and constant pain made worse with any type of movement or activity. His reported overall functional impairment was 8-10 out of 10. His current medications included Norco, Flexeril, Depakote,[18] Trazodone,[19] Simvastatin,[20] Lisinopril,[21] Cephalexin,[22] and Skelaxin. Dr. Soeter diagnosed plaintiff with right lower extremity radiculopathy with apparent L4 nerve root involvement.[23] Plaintiff was given an epidural injection and told to return to the clinic in two weeks for a second epidural injection. Dr. Soeter noted that if plaintiff had poor relief with epidurals, a neurosurgical opinion might be warranted.

---

[18] **Error! Main Document Only.**Depakote, or Valproic acid, is also used to treat mania in people with bipolar disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).
[19] **Error! Main Document Only.**Trazodone is a seratonin modulator prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia and anxiety. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).
[20] **Error! Main Document Only.**Simvastatin, also known as Zocor, is indicated for the treatment of cholesterol. See Phys. Desk Ref. 2078 (60th ed. 2006).
[21] **Error! Main Document Only.**Lisinopril is indicated for the treatment of hypertension. See Phys. Desk Ref. 2053 (61st ed. 2007).
[22] Cephalexin is a cephalosporin antibiotic used to treat bacterial infections. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682733.html (last visited June 4, 2015).
[23] "Radiculopathy is a condition caused by compression, inflammation and/or injury to a spinal nerve root. Pressure on the nerve root results in pain, numbness, or a tingling sensation that travels or radiates to other areas of the body that are served by that nerve." http://www.ninds.nih.gov/disorders/backpain/detail_backpain.htm (last visited June 4, 2015).

Plaintiff returned to see Dr. Soeter on November 17, 2011 and reported that the first lumbar epidural steroid injection had provided him approximately 20% relief for about five days. (Tr. 603-07). He stated that he continued to have pain in the lower back region, radiating down the right buttock and down the right posterior thigh just beyond the knee. He stated that it felt like it was "a vice squeezing my left butt cheek." Plaintiff stated that his goal was to decrease his narcotic intake and be able to function without relying on medication. A physical exam found minimal tenderness to palpation of plaintiff's lumbar spine or gluteus maximus muscle. His motor strength was 5/5 in the lower extremities. His straight leg raise was negative bilaterally. Dr. Soeter assessed plaintiff with low back pain, right lower extremity radicular pain symptoms, lumbar disc displacement, and degenerative changes in plaintiff's lumbar spine. Dr. Soeter provided plaintiff with his second lumbar epidural steroid injection.

On December 1, 2011, plaintiff returned to Dr. Soeter and stated that he had had 30-40% relief with the second epidural injection and it had lasted longer than the first injection. (Tr. 600-02). He also stated that he had been able to decrease his hydrocodone intake from four times a day to three times a day. He continued to complain of some pain in the right lateral thigh and calf down to the ankle. A physical examination found minimal tenderness to palpation of plaintiff's lumbar spine, motor strength 5/5 in the lower extremities, and decreased sensation to light touch to plaintiff's right medial calf. His straight leg raise was negative bilaterally, but plaintiff complained of increased low back pain with the right straight leg raise maneuver. Plaintiff was provided a third epidural injection and tolerated the procedure well. On December 28, 2011, a note from Dr. Turner's office indicated

that plaintiff had the doctor's permission to return to work on January 2, 2012 with a weight restriction of no more than 15 pounds. (Tr. 482).

Plaintiff sought mental health care from Dr. Barbour at Kneibert Clinic on January 10, 2012. (Tr. 581-82). Plaintiff indicated that he was feeling very stressed about money not coming in. He was taking medication, but stated that, "Life just seems to be overwhelming." He felt like he was "getting the run around" with his workman's compensation issues. Plaintiff stated that he was working toward social security income but the process was protracted. Dr. Barbour noted that plaintiff was frustrated with not being able to work and had a hard time seeing what options he had to obtain work. Plaintiff suggested that it was very hard on his self-esteem to feel that he was no longer capable of working and earning a good living for his family. He did not have thoughts of suicide, but he had considered in-patient treatment recently due to his increasing depressive symptoms. Dr. Barbour supported plaintiff's discussion about a home-based business idea, discussed community resources with him, and supported plaintiff in his continued follow-up with behavioral health services, medication compliance, and spending time with his family. Dr. Barbour noted that plaintiff had a sad affect, depressed mood, low self-esteem and demoralized thought content.

On January 17, 2012, plaintiff returned to Dr. Turner for a follow-up appointment. (Tr. 578-80). Plaintiff complained of back pain with a pain intensity level of 8/10 and sciatica pain. Upon examination, plaintiff had some discomfort and limitation on bending forward. He was assessed with hypercholesterolemia and uncontrolled back pain. He was prescribed Lisinopril 40 mg tablets, Simvastatin 20 mg tablets, and Norco 10-325 mg tablets.

Linda Sue Hammonds, P.M.H.N.P. treated plaintiff for mental health issues at Kneibert Clinic on January 23, 2012. (Tr. 575-77). Plaintiff reported feeling a little better since his last visit, but was still having problems with irritability. He was especially irritable because he had to go into his workplace each day and sit in a conference room with nothing to do until he was released to go back to work by his physician for workman's compensation. He expected to be released back to work later that week. Upon a review of his systems, the nurse practitioner noted that plaintiff had moderate somatic complaints and a mild depressed mood, decreased energy, anxiety, and irritability. She assessed plaintiff with an improved bipolar affective disorder, improved generalized anxiety disorder, stable insomnia and unchanged alcoholism and polysubstance abuse. She prescribed Depakote for plaintiff's mood and irritability and Trazodone for sleep.

Plaintiff saw Dr. Turner with complaints of back pain on January 26, 2012. (Tr. 572-74). Plaintiff had picked up two gallons of milk and experienced weakness in his legs and swishing in his head like he was not getting enough air and felt as if he would pass out. He had had a migraine for about two days. Dr. Turner assessed plaintiff with sinusitis and prescribed him Claritin-D 12-hour 5-120 mg tablets. On February 11, 2012, plaintiff was prescribed an ointment for a burn injury he had incurred when he tripped and his hand landed on a hot stove. (Tr. 570-71). On February 17, 2012, plaintiff told Dr. Turner that his back pain was so severe he could not lift anything and he sometimes used a cane. (Tr. 567-69). Plaintiff was prescribed Skelaxin, Norco, Lisinopril and Hydrochlorothiazide.[24]

---

[24] **Error! Main Document Only.**Hydrochlorothiazide is a diuretic used to treat high blood pressure. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682571.html (last visited on May 25, 2010).

On March 2, 2012, plaintiff returned to Poplar Bluff Regional Medical Center with low back pain, lower extremity radiculopathy, lumbar degeneration, and 20-30% relief post-epidurals. (Tr. 597-99). He verbally reported that he received good relief from the injections, but had persistent symptoms. He reported from 8-9 out of 10 down to 6 out of 10 pain control with his medication regimen. Dr. Soeter provided plaintiff a fourth epidural steroid injection and suggested he make an appointment with neurosurgeon Dr. Scott for surgical options.

Dr. Barbour saw plaintiff for a scheduled appointment on March 12, 2012. (Tr. 565-66). Plaintiff stated that he had had "a few bouts of depression," although he reported he was adherent to his medication. He was discouraged about his lack of income and bills piling up. He had been forgetful and missed several appointments. Dr. Barbour praised plaintiff for getting his therapy underway again. The doctor noted that plaintiff appeared to be coping better than when he last saw him. He found that plaintiff's mental status examination was within normal limits and instructed him to return in two weeks.

On March 19, 2012, plaintiff saw mental health nurse practitioner Hammonds for an appointment at Kneibert Clinic. (Tr. 562-64). Plaintiff stated that he had been having some ups and downs, but his mental health was improving. He was taking care of his mother who lived with him. The independent living center was paying him 17½ hours weekly to make her meals and do her laundry. He would be seeing Dr. Scott in Cape for an evaluation to see if back surgery might be beneficial. Plaintiff had not had any drug reactions, had good sleep and appearance, and overall was improved since his last visit. Hammonds continued plaintiff on Depakote for his mood and irritability and Trazodone for sleep. At a

follow-up visit with Dr. Turner on March 30, 2012, plaintiff also noted that he had an upcoming appointment with neurosurgeon Dr. Scott for his back pain. He complained of back pain with an intensity level of 8/10.

Plaintiff saw Dr. Barbour on April 4, 2012 for a scheduled therapy session. (Tr. 557-58). Plaintiff appeared to be in a very good mood and was making a little income at the Independent Living Center to help him pay for expenses. He stated that he had reunited with his wife from whom he was separated for several months due to his erratic behavior a few months ago. Plaintiff also stated that he had been able to keep himself stable with regard to his mood and circumstances even though he had some difficult emotions near the first of the year. Plaintiff seemed to be doing well and appreciated his contact with Dr. Barbour on a regular basis. At a follow-up visit with Dr. Turner on April 18, 2012, plaintiff continued to complain of back pain and walked with a limp, using a cane. (Tr. 554-56).

On April 24, 2012, plaintiff had his scheduled appointment with Brandon Scott, D.O. at Cape Spine & Neurosurgery. (Tr. 613-14). Plaintiff reported that he had attempted conservative treatment with Dr. Soeter with some relief. Dr. Scott's neurological examination found that plaintiff generally appeared well-nourished and well-groomed. Plaintiff had 5/5 motor strength throughout his bilateral upper and lower extremities. He ambulated well and he had normal reflexes. Dr. Scott noted that the MRI of plaintiff's lumbar spine showed degenerative disease throughout his lumbar spine with no significant neuroforaminal narrowing. The doctor assessed plaintiff with lumbar spondylosis.[25] Dr. Scott discussed the MRI findings with plaintiff and did not recommend any large lumbar surgery. The doctor

---

[25] Spondylosis refers to the general degeneration of the spine associated with normal wear and tear that occurs in the joints, discs, and bones of the spine as people age. http://www.ninds.nih.gov/disorders/backpain/detail_backpain.htm (last visited June 4, 2015).

recommended plaintiff to continue with conservative treatment with pain management and epidural injections.

On April 27, 2012, plaintiff had a pain clinic follow-up appointment with Dr. Soeter at which he reported 30% relief post-epidurals. (Tr. 593-96). Use of Hydrocodone[26] and Skelaxin as prescribed by his primary care physician brought his pain down from 8-9 out of 10 to 7-8 out of 10. His overall functional impairment was 5-8 out of 10. Plaintiff was provided an epidural steroid injection and told to return to the clinic in three months.

Plaintiff saw mental health nurse practitioner Hammonds at Kneibert Clinic on May 14, 2012. (Tr. 550-53). He stated that he had been feeling more depressed lately, specifically about his bills and his physical conditions. He reported seeing a specialist who had not recommended back surgery. Hammonds assessed plaintiff with deteriorated bipolar affective disorder, deteriorated generalized anxiety disorder, stable insomnia, polysubstance abuse and alcoholism. She ordered blood panels, continued plaintiff on Depakote for his mood, started plaintiff on Zoloft[27] for his depressive and anxiety symptoms, continued him on Trazodone for sleep, and instructed him to follow-up in four weeks.

Plaintiff complained of headaches and pain in his shoulders at his follow-up visit with Dr. Turner on May 22, 2012. (Tr. 547-49). Plaintiff stated that he had been rear-ended last week but had not reported it since he did not think it was bad. Skelaxin had been hurting his stomach. Upon musculoskeletal examination,

---

[26] Hydrocodone is an opiate analgesic used to relieve severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a614045.html (last visited June 4, 2015).
[27] **Error! Main Document Only.**Zoloft, or Sertraline, is a member of the SSRA class and is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder. It is also used to relieve the symptoms of premenstrual dysphoric disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

plaintiff walked with a limp and used a cane and his back remained in lordosis[28] when bending forward.  He was assessed with acute back strain and prescribed Flexeril and Norco.

At his appointment on June 11, 2012 with nurse practitioner Hammonds, plaintiff stated that taking Zoloft made him feel "like I want to jump out of my skin."  (Tr. 543-46).  He was having trouble falling asleep because of it.  Plaintiff reported that his depression had improved "a little."  His irritability was stable. Hammonds decided to have plaintiff discontinue Zoloft, start Citalopram[29] for depressive and anxiety symptoms, and continue Depakote and Trazodone.  At an appointment with Dr. Turner on June 21, 2012, plaintiff complained of facial pain and thought he had an abscess tooth.  (Tr. 539-42).  A physical examination of his general appearance, ear, nose, throat, respiratory and cardiovascular systems was normal.  He was assessed with facial pain and acute back strain.  Dr. Turner prescribed plaintiff Norco, Amoxicillin,[30] and Norvasc.[31]

On July 9, 2012, plaintiff reported to nurse practitioner Hammonds that he had been told he had become irritable since he started taking Citalopram, and he wanted to return to taking only Depakote and Trazodone.  (Tr. 535-38).  Plaintiff did not feel depressed and had not had any panic attacks.  Hammonds noted that plaintiff had mild thought disruption, moderate somatic complaints, and moderate irritability.  She consented to plaintiff's suggested course of treatment.  On July 19,

---

[28] Lordosis refers to the inward curve of the lumbar spine.  A small degree is normal, but too much curving is called "swayback."  http://www.nlm.nih.gov/medlineplus/ency/article/003278.htm (last visited June 4, 2015).

[29] **Error! Main Document Only.**Citalopram is used to treat depression.  It is in the class of selective serotonin reuptake inhibitors.  http://www.nlm.nih.gov/medlineplus/druginfo/ meds/a699001.html (last visited on May 25, 2010).

[30] **Error! Main Document Only.**Amoxicillin is an antibiotic.  See Phys. Desk Ref. 1315-16 (60th ed. 2006).

[31] **Error! Main Document Only.**Norvasc is indicated for the treatment of hypertension and coronary artery disease.  See Phys. Desk Ref. 2546 (61st ed. 2007).

2012, plaintiff complained of sharp back pain radiating down his left leg and chest pain that radiated down his left arm, which was brought on by stress and relieved by aspirin. (Tr. 532-34). Dr. Turner gave plaintiff exercises to help with his back pain, ordered a complete EKG and chest x-ray, and prescribed Percocet.[32]

The next day, on July 20, 2012, plaintiff saw Dr. Soeter at Poplar Bluff Regional Medical Center and presented the doctor with disability paperwork for his functional abilities. (Tr. 589-92). Dr. Soeter instructed plaintiff to go to Ozark Physical Therapy for a functional capacity evaluation, ordered an MRI of plaintiff's lumbar spine to evaluate the progression of his disease, provided plaintiff an epidural steroid injection and told him to return to his clinic in three months. Plaintiff requested a prescription for Oxycodone, which Dr. Soeter wrote that he was unwilling to provide.

At Kneibert Clinic on August 6, 2012, plaintiff told nurse practitioner Hammonds that his anxiety had increased since he discontinued Celexa. (Tr. 528-31). He had started to have panic attacks and noticed increased irritability. He also was not sleeping well. Hammond noted that she would start plaintiff on Wellbutrin[33] and obtain a valproic acid level. She found plaintiff to be in an anxious mood. At an appointment with Dr. Barbour on August 13, 2012, plaintiff complained that he felt emotionless, which he attributed to his current medication. (Tr. 526-27). He also reported relationship troubles. On August 20, 2012, plaintiff had a follow-up visit with Dr. Turner at Kneibert Clinic. (Tr. 523-25). Plaintiff

---

[32] **Error! Main Document Only.**Percocet is a combination of Oxycodone and Acetaminophen. Ocycodone is an opioid analgesic indicated for relief of moderate to moderately severe pain. It can produce drug dependence. See Phys. Desk. Ref. 1114 (60th ed. 2006).

[33] **Error! Main Document Only.**Wellbutrin, or Buproprion, is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder. See Phys. Desk Ref. 1648-49 (63rd ed. 2009). It may be prescribed under the brand name Zyban to help people stop smoking. See http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a695033.html (last visited Sept. 22, 2010).

complained of chest pain, but stated that it was not as frequent. He was provided a renewed prescription for Percocet.

At an appointment with nurse practitioner Hammonds on August 28, 2012, plaintiff stated that he did not feel depressed or anxious. (Tr. 519-22). Rather, he felt emotionless since he started taking Wellbutrin. Hammonds decided to start plaintiff on a small dose of Abilify and discontinue the Wellbutrin. A review of plaintiff's systems indicated that he had mild decreased energy, mild somatic complaints, and a mild problem with sleep. He had a normal mental status examination. On September 20, 2012, plaintiff reported back pain with a 7/10 intensity to Dr. Turner. (Tr. 515-18). He described the pain as sharp and intermittent. He also complained of acid reflux at night for the past month. Dr. Turner assessed plaintiff with GERD and back pain. He provided plaintiff prescriptions for Percocet, Skelaxin, and Lisinopril.

On October 15, 2012, plaintiff reported to Dr. Soeter that he had had excellent relief with the previous epidural injection. (Tr. 585-88). His reported overall functional impairment was 6 out of 10. He was provided another lumbar epidural steroid injection during his visit and was scheduled for an MRI. At his appointment with nurse practitioner Hammonds on October 18, 2012, plaintiff had improved since his last visit. (Tr. 511-14). Plaintiff's wife had noticed a substantial amount of improvement with the small dose of Abilify plaintiff was prescribed. His mood had stabilized nicely. He had run out of his medications and noted that his mood was deteriorating since he had been without them. Hammonds noted that plaintiff had a mild depressed mood, mild decreased energy, severe somatic complaints, mild irritability, and a mild problem with sleep. She assessed plaintiff

with improved bipolar affective disorder and improved insomnia. He was continued on Abilify, Depakote and Trazodone to maintain his improvement.

At his appointment with Dr. Turner on October 22, 2012 (Tr. 507-10), plaintiff was diagnosed with back pain and hypercholesterolemia and prescribed Percocet and Skelaxin. He had another MRI of his lumbar spine at the Poplar Bluff Regional Medical Center on October 24, 2012. (Tr. 616-18). The doctor who reviewed the radiology results compared the images with plaintiff's MRI from August 29, 2011 and lumbar spine radiographs from June 24, 2011. The results of the MRI showed that plaintiff had mild lumbar degenerative spondylosis[25] and no lumbar disc herniations. Dr. Turner discussed these results with plaintiff on October 29, 2012. (Tr. 504-06).

On November 15, 2012, plaintiff saw nurse practitioner Hammonds at Kneibert Clinic. (Tr. 500-03). Plaintiff reported that his medications were doing their job. He was still having a lot of problems with his back pain and commented, "Life kind of sucks." He was working with an attorney toward getting disability payments and this weighed on his mind. A review of plaintiff's systems showed he had a mild depressed mood, decreased energy, and anxiety, and severe somatic complaints. His mental status exam was within normal limits. The nurse practitioner assessed plaintiff with improved bipolar affective disorder, anxiety disorder, and insomnia and provided him prescription refills for Depakote, Abilify, and Trazodone.

At a follow-up visit with Dr. Turner on November 21, 2012, plaintiff complained of back pain with an 8/10 intensity level. (Tr. 497-99). He was walking with a cane and stated that he was doing his stretches. Plaintiff's physical

examination was normal.  Plaintiff was referred by Dr. Turner to see Michael D. Roach, D.O. on November 29, 2012.  (Tr. 494-96).  Dr. Roach noted that plaintiff's MRI showed multiple bulging discs and no herniation.  Plaintiff had stenosis[34] at the L5 level and reported that he was scheduled to see a neurosurgeon next month. Percocet controlled plaintiff's pain to some extent.  Plaintiff indicated that he wanted to try manipulation to see if this would relieve his pain.

At an appointment with Dr. Turner on December 21, 2012, plaintiff complained of chest pain off and on for 2-3 days and stated that pain radiated into his back.  (Tr. 491-93).  Plaintiff was using a cane.  Dr. Turner assessed plaintiff with sciatica and provided plaintiff a prescription for Percocet.  On January 21, 2013, plaintiff complained of diarrhea, belching and back pain.  (Tr. 488-90).  Dr. Turner assessed plaintiff with back pain and provided prescription refills for Percocet and Skelaxin.

Plaintiff saw nurse practitioner Hammonds on February 7, 2013 for an office visit for medication management.  (Tr. 484-87).  Plaintiff had run out of medication and his wife told him he needed to go to the clinic and get refills because his irritability was increasing.  He also reported that he had had a decreased appetite for a while.  Furthermore, plaintiff was not sleeping as well without Trazodone.  A review of plaintiff's systems indicated that plaintiff had mild decreased energy, mild anxiety, moderate irritability, mild impulsiveness, mild impulsiveness, a mild problem with his appetite, and moderate problems with sleep.  His mental status exam was within normal limits.  Hammonds provided plaintiff prescriptions for Depakote, Abilify and Trazodone, and instructed him to follow-up in 12 weeks.

---

[34] Stenosis is **Error! Main Document Only.**a stricture of any canal.  <u>Stedman's Med. Dict.</u> 1673 (26th ed. 1995).

At an appointment with Dr. Turner on March 22, 2013, plaintiff complained of back pain and stiffness. (Tr. 651-53). He also had been having some hot flashes or flushing and sometimes thought his blood pressure was rising. Plaintiff complained of dyspnea with exertion and nausea. Upon physical examination, plaintiff's lumbar spine remained flat when he bent forward such that he had no motion in his low back. Dr. Turner assessed plaintiff with uncontrolled back pain and noted that plaintiff needed physical therapy. The doctor provided a prescription refill for Percocet.

Also on March 22, 2013, plaintiff returned to Poplar Bluff Regional Medical Center to see Dr. Soeter. (Tr. 655-57). Plaintiff reported 40-50% relief post-epidural injections with an overall functional impairment of 6-8 out of 10. Dr. Soeter noted that Dr. Turner had recommended conservative management. Plaintiff also reported having recently seen a neurosurgeon, Dr. Tolentino, who also recommended conservative treatment. Plaintiff was given a lumbar epidural steroid injection and instructed to return to the clinic in three months.

### III. The ALJ's Decision

In the decision issued on May 3, 2013, the ALJ made the following findings:

1.    Plaintiff meets the insured status requirements of the Social Security Act through September 30, 2015.

2.    Plaintiff has not engaged in substantial gainful activity since March 1, 2008, the alleged onset date.

3.    Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine with no evidence of a herniated disc or any neurological involvement; and a bipolar disorder.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.     Plaintiff has the residual functional capacity (RFC) to perform less than the full range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except plaintiff would need to alternate sitting and standing about every hour to an hour and a half; he is restricted to simple, repetitive tasks in a low stress work environment; and he has a moderate impairment in his ability to maintain concentration, persistence and pace. "Low stress" is defined as work that can be performed at lower competitive levels as opposed to higher competitive levels and very basic one and two-step job functions that can be done by rote with very little if any exercise of independent judgment. "Moderate" is defined as the individual has difficulty in completing the task, but is able to complete it successfully.

6.     Plaintiff is unable to perform any past relevant work.

7.     Plaintiff was born on March 31, 1967 and was 40-years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.     Plaintiff has a limited education and is able to communicate in English.

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.     Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.     Plaintiff has not been under a disability, as defined in the Social Security Act, from March 1, 2008, through the date of this decision.

(Tr. 9-32).

## IV.  Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson

_v. Apfel_, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  _Buckner v. Astrue_, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A);  _Pate-Fires v. Astrue_, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  _See_ 20 C.F.R. § 404.1520;  _Moore v. Astrue_, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  _Lacroix v. Barnhart_, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  _Pate-Fires_, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  _Id._

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ("RFC"), which is the most a claimant can do despite her limitations."  _Moore_, 572 F.3d at 523 (_citing_ 20 C.F.R. ' 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may

cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence in the record, because the ALJ gave "great weight" to the opinion of Sherry Bassi, Ph.D. without resolving or considering internal consistencies in her opinion, and the ALJ failed to include all of plaintiff's limitations supported by the evidence in the RFC. Plaintiff also argues the ALJ erred by failing to provide a sufficient narrative statement linking the RFC finding to the medical evidence in the record.

### A. The RFC Assessment

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. "Because the social security disability hearing is non-adversarial, [] the ALJ's duty to develop the record exists independent of the claimant's burden in this case." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)).

## 1. Dr. Bassi's Opinion

In support of plaintiff's RFC assessment, the ALJ discussed five medical opinions in the record, the weight he gave to each of those opinions, and his rationale for the weight given. With respect to Dr. Bassi's opinion, the ALJ gave it "great weight," because the opinion was based upon a thorough review of the record and because Dr. Bassi is a specialist in the relevant field of psychiatry. The ALJ found that Dr. Bassi's opinion was consistent with the evidence concerning the psychiatric treatment plaintiff had received and his response to the treatment. The ALJ noted that plaintiff had limited mental health contacts or past history of mental health treatment, he reported that his limitations in working full-time were due to his pain conditions and not his mental health, and his mental health symptoms

were effectively controlled with medications and no additional treatment or services were necessary. A review of this evidence and the record as a whole shows that substantial evidence supports the weight the ALJ gave to Dr. Bassi's opinion.

The first section of the mental RFC assessment form Dr. Bassi completed for plaintiff is entitled "summary conclusions" and consists of checkboxes for evaluating plaintiff's capacity in four categories of mental activity: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. The checkbox options include findings of "not significantly limited," moderately limited," markedly limited," "no evidence of limitation in this category," or "not ratable on available evidence." In the "social interaction" category, Dr. Bassi found that plaintiff was moderately limited in his ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. In the third section of the form entitled "functional capacity assessment," Dr. Bassi opined that plaintiff could relate adequately to his peers and supervisors and could adapt to routine changes in a work environment. Plaintiff asserts that these findings constitute internal consistencies in Dr. Bassi's medical opinion and the ALJ's failure to resolve these inconsistences in the record was error.

On the same date that Dr. Bassi completed the mental RFC assessment form, she also completed a Psychiatric Review Technique for plaintiff, in which she elaborated upon her findings for plaintiff's limitations in social functioning. Specifically, Dr. Bassi stated that plaintiff maintained the capacity to perform simple

work in an environment that does not require stressful or complex social interactions. This statement is consistent both with Dr. Bassi's finding of moderate limitations in plaintiff's social interaction abilities and her opinion that plaintiff retained the ability to relate adequately with peers and supervisors and adapt to routine changes in the workplace. "[A] moderate limitation, as defined on the [mental RFC assessment] form itself, does not prevent an individual from functioning 'satisfactorily.'" Roberson v. Astrue, 481 F.3d 1020, 1024 (8th Cir. 2007). The Social Security regulations also do not deem moderate limitations as *per se* disabling, since a claimant must have marked limitations in at least two areas of functioning or one marked limitation and repeated episodes of decompensation to meet a listing and establish the presumption of a disability. See 20 C.F.R. § 404, Subpart P, App. 1. As such, Dr. Bassi's finding of moderate limitations in plaintiff's ability to socially interact with others does not contradict her opinion that plaintiff retained the ability to work in a low stress work environment where he could avoid stressful or complex social interactions. Accordingly, the ALJ did not err in the weight he gave to Dr. Bassi's opinion nor did he fail to resolve any inconsistences therein.

**2.    Plaintiff's Limitations Described in the RFC Assessment**

The ALJ found that plaintiff retained the RFC to perform less than the full range of light work as defined in the regulations. In recognition of plaintiff's mental impairments, the ALJ limited plaintiff to simple, repetitive tasks in a low stress work environment. He defined "low stress" as work which could be performed at a lower competitive level with very basic one and two-step job functions that could be done by rote with very little if any exercise of judgment. The ALJ noted that plaintiff had

a moderate impairment in his ability to maintain concentration, persistence and pace. He defined "moderate" as difficulty in completing the task, but an ability to complete the task successfully. Plaintiff argues that the ALJ should have included additional limitations in his RFC finding to account for plaintiff's mental and physical problems, specifically contesting the definition the ALJ provided for "moderate."

The Social Security regulations do not provide a definition for "moderate" in assessing a claimant's degree of functional limitation. See 20 C.F.R. § 404.1520a(c)(4), 416.920a(c)(4). As noted above, a finding of a "moderate limitation" does not prevent an individual from functioning satisfactorily. See Roberson, 481 F.3d at 1024; see also Lacroix, 465 F.3d at 888 ("Indeed, as noted on the evaluation form itself, a 'moderate' ranking means that 'the individual is still able to function satisfactorily.'"). Furthermore, the ALJ adequately accounted for plaintiff's moderate impairment in his ability to maintain concentration, persistence and pace by limiting him to simple, repetitive tasks in a low stress work environment. See Howard v. Massanari, 255 F.3d 577, 582 (8th Cir. 2001) (finding that the ALJ's hypothetical concerning someone who was capable of performing simple, repetitive, routine tasks adequately captured the claimant's deficiencies in concentration, persistence or pace); see also Brachtel v. Apfel, 132 F.3d 417, 421 (8th Cir. 1997) (holding that a hypothetical including the "ability to do only simple routine repetitive work, which does not require close attention to detail" sufficiently described deficiencies of concentration, persistence or pace). Thus, the ALJ did not err in his accounts of plaintiff's limitations as supported by the medical evidence in the RFC assessment.

## B. Narrative Statement in the ALJ's Decision

Lastly, plaintiff argues that the ALJ failed to provide a sufficient narrative statement in his decision to explain how the medical evidence in the record supported his conclusion. Plaintiff points to the MRI results from April 9, 2008 and August 29, 2011 and asserts that the ALJ did not explain how these test results led him to believe plaintiff could perform light work. The 2008 MRI found that plaintiff had a mild central annular disc bulge at L5-S1, but did not find significant foraminal encroachment at this level. (Tr. 408). The impression from the 2011 MRI found mild degenerative disc disease and disc bulge at the L4-5 level, but no evidence of central canal stenosis, disc protrusions, disc herniations, or spondylolisthesis. (Tr. 620-21).

In reviewing these objective test results, neurosurgeons and treating physicians repeatedly noted that plaintiff did not require back surgery and that conservative treatment consisting of physical therapy, osteopathic manipulation, pain medication, and epidural steroid injections provided relief for plaintiff's complaints of back pain. Based on this medical evidence and upon a thorough review of the evidence in the record as a whole, the Court finds that the ALJ's RFC assessment is substantially supported by the evidence in the record. The ALJ's seven-page review of the relevant medical and non-medical evidence in the record with credibility determinations and explanations of the weight given to opinion evidence provided a sufficient narrative discussion to support his RFC assessment and comport with his duties under the regulations. See 20 C.F.R. §§ 404.1545(a), 416.945(a) (stating that a claimant's RFC will be assessed based on all of the relevant medical and other evidence).

## VI. **Conclusion**

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 11th day of August, 2015.